1  David S. Markun (State Bar. No. 108067)
   Edward S. Zusman (State Bar No. 154366)
2  Kevin K. Eng (State Bar No. 209036)
   MARKUN ZUSMAN & COMPTON LLP
3  601 Montgomery Street, Suite 900
   San Francisco, CA 94111
4  Telephone: (415) 438-4515
   Facsimile: (415) 434-4505
5
   Attorneys for Plaintiff
6  Italian Colors Restaurant

7

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11  ITALIAN COLORS RESTAURANT, on        Case No.:
    behalf of itself and all similarly situated
12  persons,

13          Plaintiff,                    **COMPLAINT**
                                          **(CLASS ACTION)**
14          vs.
                                          **DEMAND FOR JURY TRIAL**
15  AMERICAN EXPRESS COMPANY and
    AMERICAN EXPRESS TRAVEL
16  RELATED SERVICES COMPANY, INC.,

17
            Defendants.
18

19

20        Plaintiff Italian Colors Restaurant, on behalf of itself and all others similarly situated,

21  alleges for its complaint against American Express Company ("American Express") and

22  American Express Travel Related Services Company, Inc. ("TRS") (together, except as the

23  context requires, "American Express"), upon knowledge with respect to its own acts and upon

24  information and belief with respect to all other matters, as follows:

25                                      **I.**

26                              **INTRODUCTION**

27        1.    American Express is the leading issuer of general purpose and corporate charge

28  cards to consumers and businesses in the United States and throughout the world.  It is also the

                                         1

1  leading provider of charge card services to merchants. In the words of the country's leading

2  credit card firm, Visa U.S.A., "American Express holds a near monopoly in the charge card

3  market."

4       2.     American Express leverages its "near monopoly" and market power in the market

5  for charge card services by requiring that merchants, as a condition of being permitted to accept

6  American Express charge cards or corporate cards, agree to accept American Express-branded

7  credit cards and debit cards at grossly supracompetitive prices (the "Tying Arrangements").

8       3.     This action challenges the Tying Arrangements as unlawful restraints of trade

9  under the federal antitrust laws. Brought on behalf of all merchants that accept American Express

10  products or that have accepted American Express products during the Statutory Period (as defined

11  below), this class action seeks an injunction permanently restraining American Express from

12  tying the provision of credit or debit card services to the charge card and corporate card services

13  that it offers merchants, as well as monetary damages.

14                          **II.**

15            **JURISDICTION AND VENUE**

16       4.     Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to

17  prevent and restrain violations of section 1 of the Sherman Act, 15 U.S.C. § 1. In addition, the

18  Plaintiff seeks damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.

19       5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22

20  and 26, because American Express "may be found or transacts business" within this District.

21  Among other things, American Express and its subsidiary TRS have marketed their charge card

22  services, along with the unlawfully tied credit card services, to thousands of merchants within this

23  District. The interstate commerce that is affected by the antitrust violations alleged in this action

24  is carried on, in part, within this District.

25  ///

26  ///

27  ///

28  ///

**III.**

**INTRADISTRICT ASSIGNMENT**

6.      Assignment to the Oakland Division of this District is proper pursuant to Civil Local Rule 3-2 because a substantial part of the events or omissions which give rise to this action occurred, and are occurring, in the county of Alameda.

**IV.**

**THE PARTIES**

7.      Plaintiff Italian Colors Restaurant, a California partnership, owns and operates the Italian Colors Restaurant in Oakland, California, where it accepts American Express cards.

8.      Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

9.      Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York.  TRS is a wholly owned subsidiary of American Express.

**V.**

**CLASS ACTION ALLEGATIONS**

10.      Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under section 1 of the Sherman Act.  Plaintiff also seeks certification as a class action under Rule 23(b)(1) and (b)(3).

11.      The class is comprised of all merchants that have accepted American Express charge cards (including the American Express corporate card), and have thus been forced to agree to accept American Express credit and debit cards, during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class").  The Class does not include American Express, its subsidiaries, directors, officers, or members of their families.

12.      The Tying Arrangements affect each merchant that accepts American Express cards.  The members of the Class are so numerous that joinder of all members is impracticable.

///

13.     There exist no conflicts of interest as between Plaintiff and the other Class members.  Plaintiff has retained counsel, including co-counsel, that is competent and experienced in federal antitrust litigation.  Plaintiff and its counsel will fairly and adequately represent the interests of the Class.

14.     In relevant respect, American Express has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate.

15.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.  The damages suffered by many members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for individual Class members to attempt to vindicate their interests individually.  There will be no extraordinary difficulty in the management of this Class action.

16.     Throughout the Statutory Period, American Express uniformly imposed the Tying Arrangements upon all Class members.  All Class members have been damaged in precisely the same fashion, by precisely the same conduct.  The degree of damages suffered by individual Class members is readily calculable according to an ascertainable formula.  For all of these reasons, questions of law and fact will predominantly be common to the Class.  Among the questions of law and fact common to the Class are:

(i)     Whether American Express demands from merchants, as a condition of being permitted to accept American Express general purpose or corporate charge cards, that the merchant must also accept American Express branded credit and debit cards and services;

(ii)    Whether American Express's Tying Arrangements are *per se* unlawful, because: (a) American Express possesses and exercises monopoly or market power in the market for charge card services, or in the market for corporate card services; or (b) American Express possesses economic power sufficient to make probable the coercive Tying Arrangements; and

///

1    (iii)   Whether the merchant discount rates that members of the Class have been forced

2            to pay for American Express-branded credit and debit card transactions exceed the

3            rates that would prevail in the absence of the Tying Arrangements, or in otherwise

4            competitive markets for credit and debit card services.

5                                              **VI.**

6                                  **FACTUAL BACKGROUND**

7        17.    Founded in 1850, American Express is primarily engaged in the business of

8    providing travel related services, financial advisory services and international banking services

9    throughout the world.

10

11   The Core Charge Card Business

12       18.    Through its wholly owned subsidiary, TRS, American Express issues to

13   consumers general purpose charge cards that include the American Express Green Card (also

14   known as the "Personal" card), American Express Gold Card, and American Express Platinum

15   Card, among others.   Charge cards, according to descriptive materials disseminated by American

16   Express, "are primarily designed as a method of payment and not as a means of financing

17   purchases of goods or services."   Charge cards require payment by the cardholder of the full

18   amount billed each month, and no finance charges are assessed (although accounts that are past

19   due are subject, in most cases, to a delinquency assessment).   Charge cards also generally carry

20   no pre-set spending limits. For purposes of this Complaint, the term "general purpose" charge

21   cards is used to refer to those charge cards that are issued directly to consumers (as opposed to a

22   corporate charge card) and that are accepted at a wide variety of merchants (as opposed to a

23   proprietary card, such as a Macy's charge card).

24       19.    In addition to issuing American Express-branded general purpose charge cards to

25   consumers, TRS acts as a "merchant acquirer," meaning that it "acquires" merchants for the

26   American Express network, and it manages all aspects of the relationship with that merchant.

27   TRS signs up new merchants through a variety of sales channels, including a proprietary sales

28   force, third party sales agents, the Internet, telemarketing and by receiving in-bound inquiries

1    from merchants who seek to do business with American Express.  Approximately four million

2    merchants have been acquired for the American Express network.

3         20.    Once a merchant enters into an agreement with TRS to accept American Express

4    products as a method of payment for goods and services, that merchant becomes known as a

5    "service establishment" in the vernacular of American Express.  When a cardholder (known as a

6    "Cardmember") presents the charge card for payment, the service establishment creates a record

7    of charge for the transaction and submits it to TRS for payment.

8         21.    Before making payment to the service establishment, TRS deducts its fee, known

9    as the "merchant discount fee."  This discount fee is calculated by taking the amount of the

10   charge submitted by the service establishment and multiplying it by the applicable "discount

11   rate."  As of April 2003, the discount rate for service establishments published on American

12   Express's website was three percent; in reality, many merchants are charged a rate higher than

13   three percent.  At the three percent rate, a merchant submitting a charge of $100 would receive

14   from TRS payment of $97.   TRS then receives payment of the $100 from the Cardmember

15   within 30 days.  To finance the float, TRS sells most charge card receivables to American

16   Express Credit Corporation, another subsidiary, which in turn issues commercial paper and sells

17   medium- and long-term notes to the public markets.

18        22.    While the discount rate charged by TRS does vary somewhat with the type of

19   participating establishment and the charge volume, it is generally far higher than the discount rate

20   that merchants pay in connection with credit cards (other than American Express-branded credit

21   cards).  The merchant discount rate for Visa, for example  (including the "interchange fee" paid

22   by the "acquiring" bank to the card-issuing bank, along with the acquirer's fee and the fees due to

23   the Visa association) is generally in the vicinity of 1.8% – more than 35% lower than the fees

24   charged by American Express.

25        23.    Merchants are willing to pay American Express's higher fees (to the extent they

26   are) in order to access a higher class of customer, to create incremental sales and to register

27   higher average per-purchase dollar amounts.  Holders of charge cards are more affluent than

28   credit cardholders, and a vastly higher percentage of charge cards than credit cards are held by

businesses and used for business travel and other corporate purposes.  Thus, in a marketing presentation to Wal-Mart several years ago, American Express emphasized that seven million holders of American Express charge cards were business customers who "are usually required by the company to use The Card for business purposes."  As American Express pointed out, other payment cards are not substitutes for these cardholders and, thus, from the merchant's point of view these transactions represent valuable incremental sales.

24.     In general, according to American Express, the average purchase on an American Express card is 17% higher than the average purchase made on a credit card.  Thus, American Express observes in its most recent SEC Form 10K that "TRS has generally been able to charge higher discount rates to participating establishments than its competitors as a result of TRS' attractive Cardmember base."

American Express And The Corporate Card Market

25.     In addition to the general purpose charge cards that TRS issues to individual consumers, American Express, through its Global Corporate Services Group ("GCSG"), issues corporate charge cards to corporations and other business entities ("Corporate Cards").

26.     According to the definition employed by GCSG, a Corporate Card is a charge card issued to individuals through a corporate account established by their employer for business purposes.  GCSG issues Corporate Cards to at least 70% of the companies included in the Fortune 500, and is likewise the leading issuer of Corporate Cards to middle-market companies (which GCSG defines as U.S. firms with annual revenues of $10 million to $1 billion and annual travel and entertainment expenditures between $100,000 and $10 million) and small businesses.

27.     American Express possesses a commanding market share in the U.S. market for Corporate Card services.  Indeed, as American Express notes in its marketing presentations to merchants, many companies require their employees to use the American Express Corporate Card for business related purchases.  American Express's competitors in the domestic market for Corporate Card services include Diner's Club, Visa U.S.A. ("Visa") and MasterCard International ("MasterCard").

7

American Express And The Credit Card Market

28.     Unlike a charge card, a "credit card" is a product that provides access to a revolving credit facility in order to finance the purchase of goods and services. At the time they receive the monthly bill, credit cardholders have the option of "revolving" their balance over into the next month and paying a predetermined interest rate to the issuer. The dominant credit card networks in the United States are Visa and MasterCard, which together account for more than 90% of all transaction volume on credit cards. In contrast to American Express's typical discount rates of three percent or more (which the company applies uniformly to its credit and charge card offerings), MasterCard's typical credit card discount rate is approximately 1.9 % or, in the language of the industry, 190 "basis points." Visa's ordinary discount rate is slightly lower.

29.     The merchant discount rate charged by Discover Card is lower yet – generally 30% below the rates charged by Visa. The Discover Card rate is the best measure of a true competitive discount rate in the U.S. credit card market, as Discover Card has no monopolistic pricing power.

30.     American Express participates in the market for general purpose credit cards through American Express Centurion Bank ("Centurion Bank"), a wholly owned subsidiary and FDIC-insured deposit institution. Centurion Bank issues Blue from American Express, the Optima Card, and all other American Express-branded revolving credit products in the United States. Whereas receivables in the charge card business are financed by American Express Credit Corporation, the receivables generated by American Express's activities in the credit card market are financed by Centurion Bank through the sale of notes and certificates of deposit.

31.     As detailed below, American Express's business in the markets for credit card issuance and credit card services has grown dramatically over the last decade, and particularly in the past several years. Substantially all of that growth is attributable to the unlawful practice of tying the provision of credit card services to the provision of general purpose charge card and Corporate Card services.

32.     American Express first launched the Optima credit card in the late 1980's. Upon information and belief, American Express service establishments were required by the terms of

1  merchant services agreements to accept Optima as a condition of being allowed to accept the

2  American Express charge cards upon which they depended.  As a result, Optima experienced no

3  difficulty in penetrating the merchant community; it simply leveraged the massive installed base

4  that American Express had developed in the market for charge card services.

5      33.    The development of Optima highlights the distinctness of the credit and charge

6  card markets.  When American Express introduced Optima, Visa urged its member banks to

7  boycott American Express products, such as traveler's checks, stressing that the new Optima

8  credit cards, unlike the traditional American Express charge card, were "directly competitive"

9  with Visa credit cards.  Indeed, Visa's CEO wrote the banks that the new Optima product "is

10 positioned to be directly competitive with your Visa and MasterCard portfolios . . . [Y]ou may

11 wish to rethink your position in offering American Express products."

12     34.    While American Express was able to leverage dominance in one market to gain a

13 foothold in another, the initial experience with Optima underscores the difficulty of navigating

14 sharply distinct market environments.  As a new entrant in the credit card market, American

15 Express applied risk screening criteria and models drawn from its experience in the charge card

16 market.  The result was disastrous, and by 1993 American Express had losses of over $2 billion

17 from bad loans in the credit card market.

18     35.    Undeterred, American Express soon redoubled its efforts to leverage its charge

19 card market power and thereby gain market share in credit cards.  "In late 1994," according to an

20 American Express 10K filing, "the Company began aggressively to expand its credit card

21 business."  Since that time – and particularly with the recent launch of its "Blue" credit card –

22 American Express's growth in the credit card business "has been among the top tier of card

23 issuers."

24     36.    Indeed, the growth of American Express's credit card business has been

25 extraordinary.  Over the past five years, the point-of-sale dollar volume of American Express's

26 credit cards has increased at least ten times more than that of any other credit card network.

27     37.    The launch of Blue was specifically designed to extend American Express into a

28 new market.  As a senior American Express executive has stated: "Blue has accomplished our

primary purpose, which was to establish American Express as more than a charge card company .
. . Blue has been a breakthrough, setting us up as a credit card issuer."

38.     In 2001, the last year for which pertinent information is available, American
Express credit card point-of-sale volume totaled more than $42 billion – almost one-quarter the
size of American Express's $181 billion charge card volume. Since 2001, American Express has
waged aggressive marketing campaigns in the credit card market on behalf of Blue. Presumably,
American Express's volume and share in the credit card markets have continued to grow since
that time.

39.     Looking forward, there is reason to expect that American Express's acquisition of
market share in the credit card market is about to accelerate sharply, fueled by the unlawful Tying
Arrangement. Beginning in or around the mid-1990's, American Express initiated a strategy
whereby it would invite banks and other qualified financial institutions in the United States to
license the American Express logo and begin issuing credit cards on the American Express
network (the "Bank Strategy"). The lynchpin of the Bank Strategy – and the value proposition
that underlay American Express's approach to banks – was the unlawful Tying Arrangement.
Because of the unlawful tie-in to American Express charge cards, issuing banks would be assured
that merchants would accept the American Express branded credit card offerings, notwithstanding
that those offerings were priced above competitive rates by a factor of roughly 35%.

40.     The Bank Strategy did not work, however, for one reason: the rules and policies
of Visa and MasterCard in the United States called for expulsion of members who issue credit
cards branded with the marks of American Express, Discover Card or any entity other than Visa
or MasterCard. In response to its inquiries, American Express found no banks that were willing
to forfeit membership in Visa or MasterCard, and the Bank Strategy appeared dead in its tracks.

41.     In 1998, however, the U.S. Department of Justice, responding in part to concerns
voiced by American Express, initiated an action in the United States District Court for the
Southern District of New York against Visa and MasterCard, alleging that the associations' rules
violate federal antitrust laws to the extent that they preclude member banks from issuing credit
cards that carry the logos of American Express or other brands other than Visa or MasterCard (the

"DOJ Case"). In October 2001, the district court ruled in favor of the Justice Department. If upheld on appeal by the U.S. Court of Appeals for the Second Circuit, the result will be that the approximately 680 banks that comprise the Visa and MasterCard networks will be contractually free to issue credit cards (and debit cards) bearing the American Express logo.

American Express's Plans After The DOJ Case

42. American Express has stated that it intends to approach these commercial banks as soon as the appeal of the DOJ Case is favorably decided or settled. More particularly, American Express plans to invite commercial banks to issue American Express-branded credit cards, secure in the knowledge that: (a) all American Express service establishments will be forced to accept those credit cards lest they forfeit the ability to accept American Express general purpose charge cards and Corporate Cards; and (b) the merchants will be forced to pay discount fees (including an interchange fee to the issuing bank) that are far higher than the rates charged by Visa and MasterCard, and at least 50% higher than the true competitive rate.

43. American Express's "value proposition" – to allow issuer banks to share in monopoly profits – is even more powerful in the debit card market, which American Express likewise intends to exploit. Pursuant to the terms of 2003 settlement agreements that have been or will shortly be entered into by Visa and MasterCard in *In Re Visa Check/Mastermoney Antitrust Litigation*, Visa and MasterCard are required to untie credit and debit card services. As a result, the typical interchange rates charged for off-line debit transactions by Visa and MasterCard have already been slashed, on a prospective basis, to approximately 85 basis points, or roughly 0.85%. Accordingly, an issuing bank that provides access to the demand deposit accounts of its depositors via an off-line debit card bearing the Visa flag or MasterCard logo will receive 0.85% of the dollar volume consummated on that card.

44. Banks issuing off-line debit products under the American Express logo stand to reap several times the interchange fees that an off-line debit issuer may earn with Visa or MasterCard. In the wake of the *Visa Check* settlement, only American Express has the power to tie the provision of debit card services to its other services (in this case, charge and Corporate

1  Card services), and thereby exact supracompetitive rents in the tied product market.  Faced with

2  the opportunity to double, and possibly triple their profits, banks will eventually commit to

3  American Express branded debit products virtually all of the resources they have available for the

4  promotion of off-line debit.

5

6  The Unlawful Tying Arrangement

7      45.    The standard form "Agreement For American Express Card Acceptance" which

8  TRS uses with merchants in the retail industry (the "Merchant Agreement") provides that the

9  merchant must accept "any card issued by [American Express] bearing [its] name, trademark,

10  service mark or logo."  Pursuant to the terms of the Merchant Agreement, a retailer may not

11  accept American Express charge cards unless it also agrees to accept American Express-branded

12  credit cards and all other American Express- branded cards.  Likewise, a retailer may not accept

13  American Express Corporate Cards unless it also agrees to accept American Express-branded

14  credit cards.

15     46.    American Express charges merchants the same discount rates on all American

16  Express-branded products, including charge, corporate charge, credit, and debit cards.

17     47.    Merchants are also precluded under the Merchant Agreements from seeking to

18  "steer" or induce customers at the point of sale to use less expensive payment media, such as

19  other credit cards, cash, or debit cards.  American Express defines such merchant conduct as

20  "suppression" of American Express cards, and it employs a policy of "canceling merchants who

21  suppress usage of the American Express Card."

22     48.    The net result of American Express's policies is that merchants are forced to

23  accept American Express-branded credit cards at supracompetitive prices.  But for the Tying

24  Arrangement, the vast majority of merchants that accept American Express would not accept

25  American Express branded credit cards at the supracompetitive discount rate charged by TRS.

26  Most merchants would not willingly pay discount fees that are at least 35% higher than

27  competitive rates.  They do not believe that accepting American Express branded credit cards

28  ///

1  attracts incremental customers or generates larger purchases, relative to alternative means of

2  payment.

3        49.    However, even for those merchants who *do* believe that accepting American

4  Express credit cards attracts incremental customers or generates larger purchases – i.e., even for

5  those merchants who would accept American Express branded credit cards absent the coercive

6  Tying Arrangements – the Tying Arrangements nevertheless cause economic injury because, in

7  the absence of the ties, the discount rate for American Express credit cards could not exceed

8  competitive levels. Given the opportunity, enough merchants would decline American Express-

9  branded credit cards that the merchant discount fees associated with those credit cards would

10  come down to a competitive level, which is best measured by the merchant discount fees charged

11  by Discover Card.

12  **VII.**

13  **RELEVANT MARKETS**

14        50.    General purpose charge card services form the product dimension of a relevant

15  market. The geographic dimension of this market is the United States (the "General Purpose

16  Charge Card Services Market").

17        51.    The dominant participant in the General Purpose Charge Card Services Market is

18  American Express. According to an informational bulletin issued by Visa, "American Express

19  holds a near monopoly in the charge card market. Its only significant competitor is Diner's

20  Club." In fact, Diners Club, which is owned by Citicorp, has less than one fifteenth the market

21  share of American Express in the market for general purpose charge cards. Many consumers do

22  not consider other payment systems suitable substitutes for their use of charge cards.

23        52.    Corporate Card services form the product dimension of another relevant market (or

24  submarket), the geographic dimension of which is the United States (the "Corporate Card

25  Services Market"). American Express possesses a commanding share of the Corporate Card

26  Services Market. From the point of view of the cardholder, other payment systems are not

27  suitable substitutes for Corporate Cards.

28  ///

13

53.     General purpose credit card services form the product dimension of another relevant market, the geographic dimension of which is the United States (the "Credit Card Services Market").

54.     General purpose credit cards are a unique product and bundle of services.  Many consumers do not consider other payment systems suitable substitutes for their use of general purpose credit cards.

55.     Because of these consumer attitudes, the acceptance of general purpose or corporate charge cards is not a substitute for the acceptance of credit cards from the point of view of merchants.  Merchants who refuse to accept credit cards will inevitably lose a significant portion of the sales they receive from consumers who value access to revolving credit.  Merchants who refuse to accept general purpose charge cards or Corporate Cards will inevitably lose a significant portion of the sales they receive from businesses, travelers, affluent consumers, and others who value the features of the general purpose charge card or the Corporate Card.

56.     In addition, as measured under the guidelines established by the United States Department of Justice and the Federal Trade Commission, there exists sufficiently low cross-elasticity of demand as between (i) general purpose charge cards or Corporate Cards, on the one hand, and (ii) general purpose credit cards, on the other, to compel the conclusion that American Express commands market power in a market for charge card services.  American Express is able to – and has –maintained prices for its core charge card services at levels that are more than 5% greater than a competitive baseline price without losing appreciable merchant acceptance, notwithstanding the existence of lower priced credit card services providers, such as Visa and MasterCard.  Indeed, if American Express has experienced any erosion in merchant acceptance it is only because price levels are some 30% or more above a competitive baseline – far higher than the DOJ Guidelines require.

## VIII.

## HARM TO COMPETITION AND TO CONSUMERS

57.     As a result of the Tying Arrangements, American Express is able to extract from merchants discount fees in the tied market for credit card services that are far higher than its

competitors' fees for credit card services.  At the same time, the fees that American Express charges merchants for services in the tying product market for charge card services (or, more narrowly, for corporate charge card services) exceed the fees charged by American Express's competitors.

58.    Accordingly, merchants pay significantly more for the tied bundle of services than they would pay in the absence of the coercive tie-in.  As merchants pass these costs along, prices rise and consumers are injured.

59.    Another effect of the Tying Arrangement is to effectively preclude a competitive low cost provider such as Discover Card, or any future credit card market entrant, from accessing the critical issuing and marketing resources of third party issuers, specifically commercial banks. By dint of the Tying Arrangements, the banks have the ability to share in supracompetitive profits by issuing American Express-branded credit cards.  Their finite issuing and marketing resources, therefore, will not be available to Discover or any future entrant attempting to provide a lower cost service.

60.    In addition, American Express's ability to charge merchants supracompetitive fees and share them with issuing banks will result in the foreclosure of a significant portion of the credit card issuing market, as issuing banks that had previously committed resources to Visa and MasterCard will dedicate their issuing and marketing resources to American Express branded cards.

61.    The Tying Arrangements will further dramatically foreclose competition in the market for off-line debit.  In the wake of the *In Re Visa Check/Mastermoney Antitrust Litigation*, only American Express will be able to promise the banks: (a) that an installed base of millions of merchants will be required to accept its off-line debit product; and (b) that those merchants will be forced to pay a supracompetitive interchange fee to the issuing bank – perhaps 500% higher than the competitive rate.  As set forth above, American Express's ability to tie debit card services to general purpose and corporate charge card services will thus absorb the finite issuing and marketing resources of issuing banks and foreclose the ability of other firms to compete.

///

# FIRST CLAIM FOR RELIEF

For Violation Of Sherman Act § 1 Through Per Se Unlawful
and Unreasonable Tying Of Charge Card Services And Credit Card Services

62.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

63.     Beginning at a time that is presently unknown to plaintiff, but not later than four years before the date of filing the instant action, American Express instituted its policy of requiring service establishments to accept American Express-branded credit cards as a condition of being permitted to accept American Express charge cards.

64.     The Tying Arrangement affects a substantial amount of interstate commerce. In particular, more than four million service establishments in every U.S. state are forced to accept American Express-branded credit cards at supracompetitive rates.

65.     The tying product, charge card services, is distinct from the tied product, credit card services. Among other things, the distinctness of the two products is evident in the very structure of American Express's businesses, as well as the company's numerous statements and disclosures, such as the American Express website, which divides all American Express cards into charge card products and credit card products.

66.     American Express and TRS have actually tied the provision of charge and credit card services, as the Tying Arrangement has been implemented in millions of merchant agreements.

67.     American Express has appreciable market power in the tying product market. As set forth above, American Express has a virtual monopoly in the market for charge card services.

68.     Even if it were considered that the product dimension of a relevant market were the provision of credit and charge card services, American Express would still possess appreciable market power (albeit without possessing a commanding market share), as evidenced by its ability to impose the Tying Arrangement upon merchants and to extract supracompetitive prices for the tied product, credit card services.

///

69. The maintenance of the Tying Arrangement has the effect of foreclosing competition and is otherwise anticompetitive.

70. The Tying Arrangement is per se unlawful. Alternatively, to the extent it is measured under a "rule of reason" analysis, the adverse effect of the Tying Arrangement upon competition as a whole in the relevant market is not outweighed by any pro-competitive virtue, and any pro-competitive virtue could be achieved through alternative means that are less restrictive of competition.

71. In the absence of appropriate injunctive relief, American Express's violations of the antitrust laws will continue unabated and the Class will continue to suffer the harms complained of in this action.

72. As a direct, foreseeable and proximate result of American Express's violation of the Sherman Act, section 1, Plaintiff and the Class have been injured in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

For Violation Of Sherman Act § 1 Through Per Se Unlawful
and Unreasonable Tying Of Corporate Card Services and Credit Card Services

73. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

74. The unlawful Tying Arrangement obligates merchants to either accept American Express-branded credit cards at grossly supracompetitive rates or forfeit the ability to accept American Express Corporate Cards.

75. American Express Corporate Cards and American Express-branded credit cards are distinct products.

76. American Express exercises market power in the Corporate Card Services Market.

77. The maintenance of the Tying Arrangement has the effect of foreclosing competition, is otherwise anticompetitive, and is both per se unlawful and an unreasonable restraint of trade.

1    78.    In the absence of appropriate injunctive relief, American Express's violations of

2  the antitrust laws will continue unabated and the Class will continue to suffer the harms

3  complained of in this action.

4    79.    As a direct, foreseeable and proximate result of American Express' violation of the

5  Sherman Act, section 1, the Plaintiff and the Class has been injured in an amount to be

6  determined at trial.

7  **THIRD CLAIM FOR RELIEF**

8  For Violation Of Sherman Act § 1 Through Per Se Unlawful and Unreasonable
Tying Of (a) Charge or Corporate Card Services, and (b) Debit Card Services

9

10    80.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set

11  forth herein.

12    81.    Debit cards allow a cardholder to access his or her bank or brokerage account

13  directly at the point of sale either "on-line" (via a PIN pad) or "off-line" (by signing a slip).

14  American Express currently issues two off-line debit products, Fidelity American Express Gold

15  Card and Fidelity American Express Platinum Cards, both of which allow users to access at the

16  point of sale accounts maintained at Fidelity Investments.

17    82.    Further, as detailed above, American Express currently has plans to engage

18  commercial banks to issue off-line debit cards under the American Express logo.

19    83.    The unlawful Tying Arrangement obligates merchants to either accept these

20  American Express-branded debit products at grossly supracompetitive rates or forfeit the ability

21  to accept American Express charge cards (including American Express Corporate Cards).

22    84.    Debit cards are a distinct product from Corporate Cards. Debit cards are also a

23  distinct product from general purpose charge cards.

24    85.    The maintenance of the Tying Arrangement as applied to debit cards has the effect

25  of foreclosing competition, and is both per se unlawful and an unreasonable restraint of trade.

26    86.    In the absence of appropriate injunctive relief, American Express's violations of

27  the antitrust laws will continue unabated and the Class will continue to suffer the harms

28  complained of in this action.

18

## FOURTH CLAIM FOR RELIEF

<u>For Violation Of Sherman Act §§ 1 and 2 Based On The "Insulation Provisions"</u>

87.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

88.     In pertinent part, section 2 of the Sherman Act prohibits a defendant in possession of monopoly power in the relevant market from willfully acting to maintain its ability to exercise monopoly power to the detriment of plaintiffs.  Section 1 of the Sherman Act, in pertinent part, prohibits contracts in restraint of trade.

89.     American Express possesses monopoly power in the relevant markets for corporate card services and charge card services.

90.     American Express's ability to maintain and exercise its monopoly power is threatened  by the availability of class action lawsuits as tools for challenging American Express's anticompetitive practices.  Indeed, as American Express is aware, class action litigation is the only viable tool available to redress the sort of unlawful tying arrangements that are at issue in this action.

91.     In order to maintain its ability to exercise monopoly power, American Express imposes upon merchants in its standard form merchant services agreements a provision designed to insulate itself from any class-wide liability for antitrust violations (the "Insulation Provisions"). Under the terms of the Insulation Provisions, the merchant (i) forfeits the ability to act as a representative plaintiff in any class action; (ii) forfeits the ability to be a passive class member (and presumably to share in the benefit of any award) in any class action; and (iii) forfeits any right to have his or her claim consolidated or aggregated with any claim asserted by any other merchant in any arbitration.  American Express's practice is to insert the Insulation Provisions into standard form adhesion contracts with merchants that lack the power to negotiate individual terms.

92.     If the Insulation Provisions were given effect, then all merchants would suffer injury, because enough merchants would be precluded from participating in (or even being represented in) a class action that the efficacy of the action would be substantially eviscerated.

1    93.    In the absence of an Order declaring that the Insulation Provisions violate

2  sections 1 and 2 of the Sherman Act and are therefore unenforceable, the Class will suffer

3  irreparable harm.

4

5    WHEREFORE, Plaintiff respectfully demands:

6    A.    That the Court declare, adjudge and decree that Defendants have committed the

7  violations of federal law alleged herein;

8    B.    That the Court declare that the imposition of the Insulation Provisions violates

9  sections 1 and 2 of the Sherman Act, and that the Court permanently enjoin and restrain the

10  enforcement of the Insulation Provisions;

11    C.    That the Court enter an Order pursuant to Fed. R. Civ. P. 23 permitting this action

12  to be maintained as a class action on behalf of the Class specified herein;

13    D.    That defendants be permanently enjoined and restrained from implementing or

14  enforcing the Tying Arrangements, or from entering into agreements with merchants whereby the

15  ability of the merchant to accept American Express general purpose or corporate charge cards is

16  conditioned upon its agreement to accept American Express credit or debit cards;

17    E.    That the Court award damages for violations of the First and Second Claims For

18  Relief in amounts to be determined at trial and then trebled;

19    F.    That the Court award attorneys' fees and costs of suit; and

20    G.    That the Court award such other and further relief as it may deem just and proper.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

## JURY DEMAND

2       Plaintiffs hereby demand trial by jury of all issues so triable.

3

4                                      Respectfully submitted,

5    Dated:  August 8, 2003            MARKUN ZUSMAN & COMPTON LLP

6

7                              By: _____
                                       David S. Markun
8                                      Edward S. Zusman
                                       Kevin K. Eng
9                                      Attorneys for Plaintiff
                                       Italian Colors Restaurant
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT